# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|                                                    |     |                                   |
| -------------------------------------------------- | --- | --------------------------------- |
|                                                    | )   |                                   |
| CONSERVATION FORCE,                                | )   |                                   |
|                                                    | )   |                                   |
| Plaintiff,                                         | )   |                                   |
|                                                    | )   |                                   |
| v.                                                 | )   | Civil Action No. 12-cv-1665 (KBJ) |
|                                                    | )   |                                   |
| SALLY JEWELL, Secretary of the U.S.                | )   |                                   |
| Department of the Interior, *et al.*,              | )   |                                   |
|                                                    | )   |                                   |
| Defendants.                                        | )   |                                   |
|                                                    | )   |                                   |

## MEMORANDUM OPINION

In 2009, the Fish and Wildlife Service ("FWS") denied a series of permit applications that would have allowed certain individuals to import hunting trophies of Canadian bison into the United States. In a search for documents related to that FWS determination, Plaintiff Conservation Force ("Plaintiff"), a nonprofit foundation, submitted a written request to the agency under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (2012), and followed with this lawsuit after that document request went entirely unanswered. The instant complaint—which was brought under the FOIA against the FWS, the Department of the Interior, and some of the executive officers of those agencies in their official capacity (collectively, "Defendants")—was filed on October 4, 2012. Thereafter, Defendants provided a number of responsive documents to Plaintiff, many of which were redacted.

Before this Court at present are the parties' cross-motions for summary judgment regarding the only remaining issue: whether the FWS's redactions constitute proper withholdings under Exemptions 5 and 6 of the FOIA. Defendants argue that those

statutory exemptions apply because the documents contain privileged and/or sensitive information, while Plaintiff asserts that Defendant's Vaughn Index and Declaration are insufficient to demonstrate the propriety of Defendants' invocation of those FOIA Exemptions.  Upon consideration of the parties' submissions, the relevant authorities, and the record as a whole, this Court will **GRANT IN PART** Defendants' motion for summary judgment, and will enter judgment in Defendants' favor with respect to the Exemption 5 redactions in the existing Vaughn Index that are based solely on the attorney-client privilege and also with respect to Defendant's redaction of personal information from the documents at issue in accordance with Exemption 6.  Both parties' motions for summary judgment will be **DENIED WITHOUT PREJUDICE** regarding all other exemption grounds, and Defendants will be permitted to submit a more robust Vaughn Index or affidavit regarding the redactions.  A separate order consistent with this opinion will follow.

## I.    BACKGROUND

Plaintiff is a non-profit foundation that promotes big game hunting and describes itself as having been "formed for the purpose of wildlife conservation, related education, and wildlife research."  (Compl., ECF No. 1, ¶ 9.)[1]  Defendants are the agencies of the federal government that are responsible for implementing the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544 (2014), which is a statute that generally prohibits the importation of endangered or threatened species in any form including hunting trophies.[2]

_____

[1] Plaintiff maintains "that hunters and anglers are an indispensable and essential force for wildlife conservation."  Conservation Force, *Conservation of Wildlife and the Natural World*, http://www.conservationforce.org (last visited Aug. 25, 2014).

[2] A hunting trophy is "a whole dead animal or a readily recognizable part or derivative of an animal" that "(1) [i]s raw, processed, or manufactured; (2) [w]as legally obtained by the hunter through hunting for his or her personal use; [and] (3) [i]s being imported, exported, or re-exported by or on behalf of the

2

Under the ESA's statutory and regulatory scheme, the FWS may allow importation of hunting trophies "for scientific purposes or to enhance the propagation or survival of the affected species[,]" *Conservation Force v. Salazar (Wood Bison II)*, 851 F. Supp. 2d 39, 43 (2012) (citing 16 U.S.C. § 1539(a)(1)(A) and 50 C.F.R. § 17.22), but "[i]ndividuals seeking to import hunting trophies of an endangered species must apply for a permit and satisfy a number of application requirements." *Id.* Upon receipt of such a permit application, the FWS is duty-bound to follow certain steps, including publishing a notice in the Federal Register, allowing for a notice and comment period, and considering certain mandatory criteria. *Id.*

This is Plaintiff's third lawsuit regarding a series of import permit applications for Canadian wood bison, a species that has been listed as "endangered" under the ESA since 1970. *See* Petition to Reclassify the Wood Bison from Endangered to Threatened, 74 Fed. Reg. 5908, 5909 (Feb. 3, 2009).[3] The litigation saga began in the year 2000, when Conservation Force helped four individuals file import permit applications for Canadian wood bison under the ESA. (Compl. ¶¶ 17-20.) After the FWS sat on the permit applications for years without making a decision, the organization and those individuals filed suit under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 (2014), to compel the FWS to make a decision on the applications. (Compl. ¶ 21; *Conservation Force v. Salazar*, No. 09-cv-0496 (D.D.C. filed Mar. 16, 2009)). The FWS finally acted to deny the permit applications shortly after the complaint was filed, and as a result, that

---

hunter as part of the transfer from its country of origin ultimately to the hunter's country of usual residence. . . ." *See* 50 C.F.R. § 23.74(b).
[3] *See Conservation Force v. Salazar*, No. 09-cv-0496 (D.D.C. filed Mar. 16, 2009); *Conservation Force v. Salazar*, No. 10-cv-1057 (D.D.C. filed June 23, 2010); *Conservation Force v. Jewell*, No. 12-cv-1665 (D.D.C. filed Oct. 4, 2012).

case was dismissed as moot. *Conservation Force v. Salazar (Wood Bison I)*, 715 F.

Supp. 2d 99, 105-08 (D.D.C. 2010).

The *Wood Bison I* plaintiffs then filed a second lawsuit, alleging that the FWS's

denials of their permit applications violated the ESA and the APA. (*See* Compl. ¶ 22.)

*See also Wood Bison II*, 851 F. Supp. 2d at 42. The gravamen of the plaintiffs' claim in

*Wood Bison II* was that the agency "acted arbitrarily and capriciously in denying the

individual plaintiffs' applications to import wood bison hunting trophies." *Id.* The court

in *Wood Bison II* (Bates, J.) granted in part and denied in part the plaintiffs' motion for

summary judgment, finding that the FWS had failed to articulate a satisfactory

explanation for denying the hunting-trophy importation permits despite the

overwhelming scientific evidence that supported issuing the permits. *Wood Bison II*, 851

F. Supp. 2d at 54. Significantly for present purposes, the *Wood Bison II* court agreed

with the plaintiffs that the administrative record reflected a strange about-face on the part

of the agency: after gathering substantial scientific evidence (perhaps even a consensus)

that sport-trophy hunting would not jeopardize the wood bison and thus importation

permits could be issued consistent with the objectives of the ESA, the FWS nevertheless

denied the permits. *Id.* at 45-46, 50-53. The denial appears to have resulted from the

influence of an attorney-advisor within the government, who purportedly expressed his

disagreement with any decision to issue the permits based on policy grounds, *id.* at 49-

50, but the attorney's specific rationale for recommending denial of the permits was

redacted from the administrative record that was submitted for the *Wood Bison II*

litigation due to the agency's invocation of the attorney-client privilege.[4]

---

[4] During the *Wood Bison II* litigation, the parties disputed the scope of the administrative record. FWS amended the administrative record twice, then eventually withheld eight documents in their entirety as

It is the redacted rationale for the denial of the importation permits that Plaintiff sought to uncover through the FOIA request that is at the heart of the instant litigation. (*See* Pl.'s Combined Opp'n to Defs.' Mot. for Summ. J. & Cross-Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 17, 6-7 ("Plaintiff filed the FOIA request that has led to this litigation" based on its belief that "any description of the actual reasons for FWS's permit denials [must] be found somewhere in the material withheld as privileged" from the administrative record in *Wood Bison II*.).) On April 16, 2012, Plaintiff submitted a letter to the Fish and Wildlife Service requesting "any and all documents, correspondence, and notes of meetings between the Fish and Wildlife Service and the Office of the Solicitor regarding import permits for Canadian wood bison trophies since 2000" including "any documents excluded as purportedly 'privileged' from the administrative record in" *Wood Bison II*. (Defs.' Facts; ECF No. 16-1, ¶ 1; Suppl. Decl. of Timothy J. Van Norman ("Suppl. Van Norman Decl."), ECF No. 16-3, ¶ 2.) The request listed specific documents of interest, including documents from meetings in which the FWS discussed the wood bison permits. (Defs.' Facts ¶ 1; Suppl. Van Norman Decl. ¶ 2.) The FWS acknowledged receipt of Plaintiff's request on April 19, 2012 (Suppl. Van Norman Decl. ¶ 2), but still had not responded by October of that year, when Plaintiff filed the instant complaint. (Compl. ¶¶ 35-36.)

On November 19, 2012, approximately one month after the complaint in this case was filed, Defendants requested a stay while the agency reviewed its files in order to respond to the FOIA request, and over the next month, the FWS proceeded to produce and release to Plaintiff 1,026 pages of responsive documents. (Suppl. Van Norman Decl.

---

privileged and made other redactions to remove allegedly privileged or irrelevant information. *See* Admin. R., *Wood Bison II*, No. 10-cv-1057 (D.D.C. Nov. 2, 2010), ECF Nos. 23; Errata re Admin. R, *Wood Bison II*, No. 10-cv-1057 (D.D.C. Nov. 4, 2010), ECF No. 24; Second Errata re Admin. R., *Wood Bison II*, No. 10-cv-1057 (D.D.C. Nov. 8, 2010), ECF No. 25.

¶ 5.)  Defendants released a second set of responsive documents on January 9, 2013, which consisted of the 577 partially-redacted pages that are the subject of the instant dispute.  (*Id.* ¶ 6.)

Defendants filed a motion for summary judgment on March 13, 2013, maintaining that "its withholding of certain documents in their entirety and its redaction of portions of other documents are supported by appropriate exemptions"; specifically, FOIA Exemptions 5 and 6.  (Defs.' Mot. for Summ. J. ("Defs.' Mot."), ECF No. 16, at 3.) Plaintiff filed a cross-motion for summary judgment on April 12, 2013, asserting that "Defendants have failed to carry their burden to sustain the [FWS's] withholding of portions of documents responsive" to the FOIA request, and that "there is evidence showing the redactions contain non-exempt records stating FWS's hidden reasons for denying the permits underlying this suit."  (Pl.'s Mot. at 1.)  The parties' cross-motions for summary judgment are now ripe for consideration.

## II.     LEGAL FRAMEWORK

### A.     Summary Judgment In FOIA Cases

"FOIA cases typically and appropriately are decided on motions for summary judgment."  *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citing *Bigwood v. U.S. Agency for Int'l Dev.*, 484 F. Supp. 2d 68, 73 (D.D.C. 2007)).  Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  In the FOIA context, a district court reviewing a motion for summary judgment conducts a de novo review of the record, and the responding

federal agency bears the burden of proving that it has complied with its obligations under the FOIA. *See* 5 U.S.C. § 552(a)(4)(B); *see also In Def. of Animals v. Nat'l Insts. of Health*, 543 F. Supp. 2d 83, 92-93 (D.D.C. 2008) (citing *Assassination Archives & Research Ctr. v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003)). The court must analyze all underlying facts and inferences in the light most favorable to the FOIA requester. *See Willis v. Dep't of Justice*, 581 F. Supp. 2d 57, 65 (D.D.C. 2008) (citing *Moore v. Aspin*, 916 F. Supp. 32, 35 (D.D.C. 1996)). Accordingly, summary judgment for an agency is only appropriate if the agency proves that it has "fully discharged its [FOIA] obligations[.]" *Moore*, 916 F. Supp. at 35 (citing *Miller v. Dep't of State*, 779 F.2d 1378, 1382 (8th Cir. 1985)).

A court may award summary judgment based solely upon the information provided in affidavits or declarations if the affidavits or declarations describe "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). Such affidavits or declarations "are accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)).

### B.     FOIA—Purpose & Exemptions

The statute known as the FOIA is a revision of the public disclosure section of the APA.[5]  Congress "broadly conceived" the FOIA "to permit access to official information long shielded unnecessarily from public view and [] to create a judicially enforceable public right to secure such information from possibly unwilling official hands." *Id.* at 80.  To that end,"[t]he FOIA requires every federal agency, upon request, to make 'promptly available to any person' any 'records' so long as the request 'reasonably describes such records.'" *Assassination Archives*, 334 F.3d at 57 (quoting 5 U.S.C. § 552(a)(3)).  However, the statute also "recognizes limitations that compete with the general interest in disclosure, and that, in appropriate cases, can overcome it." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004).  "Thus, while 'disclosure, not secrecy, is the dominant objective of FOIA,' there are [nine] exemptions from the statute's broad reach," under which agencies may refuse to disclose requested information.  *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 494 (1994) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)); 5 U.S.C. § 552(b). "These exemptions stem from Congress's recognition that the release of certain information may harm legitimate governmental or private interests." *Summers v. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998).

At issue in this case are FOIA Exemptions 5 (5 U.S.C. § 552(b)(5)) and 6 (5 U.S.C. §552(b)(6)).  Exemption 5 protects "inter-agency or intra-agency memorand[a] or letters which would not be available by law to a party other than an agency in litigation

---

[5] As originally enacted, the APA gave agencies broad discretion over the publication of government records.  *See EPA v. Mink*, 410 U.S. 73, 79 (1973), *superseded by statute on other grounds*.  The public disclosure section of the APA was initially "plagued with vague phrases"; limited disclosure of official records to certain persons; and "provided no remedy for wrongful withholding of information." *Id.* Indeed, the section "was generally recognized as falling far short of its disclosure goals and came to be looked upon more as a withholding statute than a disclosure statute." *Id.*

with the agency."  5 U.S.C. § 552(b)(5).  The House Report on the FOIA states that

Exemption 5 was enacted in response to agency witnesses who had "argued that a full

and frank exchange of opinions [among agency personnel] would be impossible if all

internal communications were made public."  H.R. Rep. No. 89-1497, at 10 (1966).  To

address that concern, Exemption 5 shields internal agency discourse to the extent that (1)

the source of the document is a government agency, and (2) the document "fall[s] within

the ambit of a privilege against discovery under judicial standards that would govern

litigation against the agency that holds it."  *Dep't of Interior v. Klamath Water Users*

*Protective Ass'n*, 532 U.S. 1, 8 (2001).  Courts applying this rule have recognized that

Exemption 5 applies to materials that would be protected under the deliberative process

privilege, the attorney-client privilege, and the work product doctrine.  *See e.g.*, *Coastal*

*States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980).

Exemption 6 protects "personnel and medical files and similar files the disclosure

of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C.

§552(b)(6).  The House Report on the FOIA states that Exemption 6 was intended to

strike a "balance between the protection of an individual's right of privacy and the

preservation of the public's right to Government information by excluding those kinds of

files the disclosure of which might harm the individual."  H.R. Rep. No. 89-1497, at 11

(1966).  With respect to the types of documents the statutory exemption contemplates,

the Supreme Court has held that the universe of exempted materials is not limited to "a

narrow class of files containing only a discrete kind of personal information," *U.S. Dep't*

*of State v. Washington Post Co.*, 456 U.S. 595, 602 (1982), but instead extends to "all

information that applies to a particular individual," *Lepelletier v. FDIC*, 164 F.3d 37, 46

(D.C. Cir. 1999).   Once it is determined that the item at issue is a personnel, medical, or

similar file, the court must then "consider whether disclosure of the requested information would result in an invasion of privacy, and if so, the extent and seriousness of that invasion, as well as the extent to which disclosure would serve the public interest." *U.S. Dep't of Def. Dep't of Military Affairs v. Fed. Labor Relations Auth.*, 964 F.2d 26, 29 (D.C. Cir. 1992).

In all events, the "'burden is on the agency' to show that the requested material" need not be produced because a particular FOIA exemption protects the material from disclosure. *Petroleum Info. Corp. v. Dep't of the Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992) (quoting 5 U.S.C. § 552(a)(4)(B)). To allow the court to determine whether application of an exemption is proper, the agency must "provide a detailed description of the information withheld through the submission of a so-called 'Vaughn Index,' sufficiently detailed affidavits or declarations, or both." *Defenders of Wildlife*, 623 F. Supp. 2d at 88 (quoting *Bigwood*, 484 F. Supp. 2d at 74). If the agency submits a Vaughn Index, that document must "provide[ ] a relatively detailed justification, specifically identif[y] the reasons why a particular exemption is relevant and correlate[] those claims with the particular part of a withheld document to which they apply." *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006) (quoting *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977)). There is no set form for a Vaughn Index, *see Hall v. Dep't of Justice*, 552 F. Supp. 2d 23, 27 (D.D.C. 2008), but the agency "must 'disclose as much information as possible without thwarting the exemption's purpose.'" *Id.* (quoting *King v. Dep't of Justice*, 830 F.2d 210, 224 (D.C. Cir. 1987)). At the very least, the Vaughn Index must provide information about the originating agency, the author, and the recipient of the document, *see Defenders of Wildlife*, 623 F. Supp. 2d at 88, because such information "enable[s] the court and the

opposing party to understand the withheld information in order to address the merits of the claimed exemptions." *Judicial Watch*, 449 F.3d at 150. Furthermore, the Index must include more than a "broad categorical description[,]" which would not allow "a reviewing court to engage in a meaningful review of the agency's decision." *Hall*, 552 F. Supp. 2d at 27 (citing *Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996)). It is also patently insufficient for the agency "merely [to] recite the statutory standards" set forth in the exemptions, *Carter v. U.S. Dep't of Commerce*, 830 F.2d 388, 392-93 (D.C. Cir. 1987); *see also Defenders of Wildlife*, 623 F. Supp. 2d at 89 (requiring more than "bare legal conclusions regarding the exemptions relied upon by [the agency] to justify withholding"); *King*, 830 F.2d at 219 (noting that an agency cannot survive summary judgment by providing statements that are "conclusory, merely reciting statutory standards, or if they are too vague or sweeping" (citation omitted)).

## III. DISCUSSION

Defendants here maintain that they properly withheld certain information from the FOIA response pursuant to Exemptions 5 and 6.[6] Plaintiffs argue that Defendants' documents—particularly the Vaughn Index and the Supplemental Declaration of Timothy J. Van Norman, Chief of the FWS's permitting division—fall woefully short of the level

---

[6] Defendants' Vaughn Index also lists Exemption 4 as a basis for the redactions of the "agency's account information" in two documents. (Vaughn Index at Docs. 56, 59.) *See also* 5 U.S.C. § 552(b)(4) (permitting "trade secrets and commercial or financial information obtained from a person" that is "privileged or confidential" to be withheld). Defendants do not mention the Exemption 4 withholdings in their summary judgment motion, and Plaintiff has not contested the propriety of the Exemption 4 redactions in its opposition. Consequently, this Court will deem conceded any argument or issue regarding the Exemption 4 redactions. *See Lewis v. District of Columbia*, No. 10-5275, 2011 WL 321711, at *1 (D.C. Cir. Feb. 2, 2011) (per curiam) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." (quoting *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd*, 98 F. App'x 8 (D.C. Cir. 2004))); *see, e.g., Sellers v. Dep't of Justice*, 684 F. Supp. 2d 149, 163 n.4 (deeming as conceded certain withholdings that the plaintiff did not oppose). As a result, the only issues before this Court for the purpose of the cross-motions for summary judgment are whether Defendants properly applied Exemptions 5 and 6.

of specificity required to justify withholdings under either exemption.  (*See* Pl.'s Mot. at 14-17.)  For the reasons that follow, this Court concludes that Defendants have met their burden of justifying certain Exemption 5 withholdings—specifically, those grounded in the attorney-client privilege—but have not sufficiently justified the Exemption 5 redactions that purportedly were made pursuant to the deliberative process privilege or the work product doctrine.  This Court also concludes that Defendants have provided sufficient justification for withholding certain information pursuant to Exemption 6.

### A.      Exemption 5 Withholdings

In this case, Defendants produced over one thousand pages of documents in response to Plaintiff's request for correspondence and notes from any meetings regarding the wood bison permits at issue in the earlier litigation, but made redactions to 175 documents.  (*See* Vaughn Index.)  The vast majority of documents that were redacted are emails; however, Defendants also redacted some memoranda.  (*See, e.g.*, *id.* at Doc. 121 (memoranda authorizing the DOJ to negotiate a fee settlement from the *Wood Bison* litigation).)  The redacted documents also include various documents that are purportedly in draft form, such as draft declarations from FWS employees for the earlier *Wood Bison* litigation (*see, e.g.*, *id.* at Doc. 96 ("DRAFT—Declaration of Teiko Saito (pre-decisional)"), and draft agency determinations, (*see, e.g.*, *id.* at Doc. 2 ("DRAFT—Determination of Enhancement under the ESA for the import of Sport-hunted wood bison trophies from Canada (pre-decisional)")), 106 ("DRAFT—Import of sport-hunted wood bison trophies from Canada (pre-decisional)")).

Defendants assert three different grounds for Exemption 5 protection:  the deliberative process privilege, the attorney-client privilege, and the work product

doctrine; the index sometimes asserts multiple grounds for redactions in a single document.  (*See, e.g.*, Vaughn Index at Docs. 3 (attorney-client privilege and work product doctrine), 8 (all three privileges), 94 (attorney-client privilege and deliberative process privilege).)  Plaintiff objects to all three grounds for withholding generally, contending that Defendants' Vaughn Index and supporting affidavit do not provide sufficient specificity with respect to the application of any of the privileges (Pl.'s Mot. at 14-16), and Plaintiff also launches specific attacks on certain of Defendants' claims of deliberative process privilege and attorney-client privilege. (*See, e.g.*, *id*. at 17-18 (arguing that the agency used the deliberative process privilege and attorney-client privilege to withhold portions of the record that reveal the agency's "specific, non-biological reasons" for permit denials).)

As a general matter, with respect to all three asserted privileges for Exemption 5, there is no dispute that the documents at issue are "inter-agency or intra-agency documents."  *See Nat'l Inst. of Military Justice v. U.S. Dep't of Defense*, 404 F. Supp. 2d 325, 343 & n.10 (D.D.C. 2005) *aff'd*, 512 F.3d 677 (D.C. Cir. 2008).  Indeed, Plaintiffs do not contest this fact in their opposition.  *See Lewis*, 2011 WL 321711, at *1. Consequently, the heart of the dispute here lies in the second step of the Exemption 5 analysis, *i.e.*, whether Defendants have established that the alleged privilege would apply and thus the document "would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5); *see also FTC v. Grolier Inc.*, 462 U.S. 19, 26 (1983).  This Court will address each alleged Exemption 5 basis in turn.

1.    The Deliberative Process Privilege

First, Defendants claim that the deliberative process privilege justifies the redaction of certain documents under Exemption 5.  (*See* Defs.' Mot. at 7.)  The deliberative process privilege applies when material that would otherwise have been responsive to a valid FOIA request implicates the "decisionmaking processes of government agencies," including "documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'"  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (quoting *Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.C.1966) "The purpose of the deliberative process privilege is to ensure open communication between subordinates and superiors, prevent premature disclosure of policies before final adoption, and to avoid public confusion if grounds for policies that were not part of the final adopted agency policy happened to be exposed to the public."  *Wilderness Soc'y v. U.S. Dep't of Interior*, 344 F. Supp. 2d 1, 10 (D.D.C. 2004).  Notably, "[t]he deliberative process privilege protects agency documents that are both predecisional and deliberative."  *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006).  A document  is "predecisional if 'it was generated before the adoption of an agency policy' and deliberative if 'it reflects the give-and-take of the consultative process.'"  *Id.*

Defendants have specifically invoked the deliberative process privilege to justify the redactions in six of the documents that are listed in their Vaughn Index.  (Vaughn Index at Docs. 8, 95, 96, 140, 141, 144.)[7]  Defendant's Vaughn index classifies each

---

[7] The index employs a code that permits Defendants to identify the particular FOIA Exemption and basis that it is being claimed with respect to each redaction.  For redactions that were made pursuant to

document as either an "information document" or "email[,]" *id.*; characterizes the

document as a "draft"; and also lists the subject of each document. *Id.* A typical subject

matter identifier for the documents that have been redacted on the basis of the

deliberative process privilege reads: "DRAFT—wood bison certification (pre-

decisional)." (*Id.* at Doc. 141). In some cases, the index also includes a date and the

name of the sender and the recipient of the document. (*Id.* at Docs. 8, 140, 141, 144.)

There are also 27 other entries in Defendants' Vaughn Index that use language

suggesting invocation of the deliberative process privilege but there is no specific

designation regarding the deliberative process privilege next to those entries, and thus it

is unclear whether Defendant intends for the deliberative process privilege to apply to

these entries as well. (*See* Vaughn Index at Docs. 76-77; 82; 93-98; 104-106; 109-10;

112-13; 119; 129-31; 137-38; 140-42; 144; 150; 152; 160-61; 164; 166; 175 (describing

each document as "draft document, information is pre-decisional".) Regardless, and even

assuming that Defendants meant for the deliberative process privilege to apply to all of

the index entries that contain a description including language such as "draft" or

"predecisional," this Court finds that, under the applicable legal standards, Defendants'

Index is insufficient to establish proper application of the deliberative process privilege

in three respects.

First, Defendants appear to rely primarily (if not solely) on the fact that each of

the documents is a "DRAFT"—but that designation alone does not establish that any

document is predecisional and deliberative, which proper invocation of the deliberative

process privilege requires. *See Wilderness Soc'y*, 344 F. Supp. 2d at 14 ("The District of

---

Exemption 5 on the basis of the deliberative process privilege, for example, the annotation "5-DP"
appears in the index entry with respect that item. (*See, e.g.*, Vaughn Index at Doc. 8.)

Columbia Circuit has made clear that simply designating a document as a 'draft' does not automatically make it privileged under the deliberative process privilege." (citing *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257 (D.C. Cir. 1982)). While it is true that the deliberative process privilege can protect "recommendations, draft documents, proposals, [and] suggestions," the privilege extends *only* to those documents that qualify as *pre*decisional insofar as they were "generated before the adoption of an agency policy" and may "inaccurately reflect or prematurely disclose the views of the agency, suggesting as agency position that which is as yet only a personal position." *Coastal States*, 617 F.2d at 866. Accordingly, even a document that is in draft form cannot be withheld as predecisional if it is later "adopted, formally or informally, as the agency position on an issue" or "used by the agency in its dealings with the public." *Id*. The privilege is also limited to documents that qualify as "deliberative," meaning that "it reflects the give-and-take of the consultative process." *Id*. Thus, notwithstanding its status as a "draft," a document that does not reflect the genuine evolution of an agency's decisionmaking process and instead merely recites "factual information which does not bear on [] policy formation," *Wilderness Soc'y*, 344 F. Supp. 2d at 14, is not entitled to protection under the deliberative process privilege.

Here, Defendants' submissions fail to demonstrate that the "draft" documents being referenced are, in substance, expressing the "ideas and theories which go into the making of the law" rather than "the law itself," *Sterling Drug, Inc. v. FTC*, 450 F.2d 698, 708 (D.C. Cir. 1971), and thus properly qualify as predecisional, nor do Defendants' submissions clarify whether the redacted drafts merely summarized factual matters relevant to an agency decision or were the type of documents related to the "formulation or exercise of agency policy-oriented *judgment*" that the privilege properly protects.

16

*Petroleum Info. Corp.*, 976 F.2d at 1435 (emphasis in original); *see also Elec. Frontier Found. v. U.S. Dep't of Justice*, 826 F. Supp. 2d 157, 169 (D.D.C. 2011). That is, while an exchange between FWS employees consisting of "continual expression of ideas and strong advocacy of positions" in an upcoming permitting decision could be both predecisional and deliberative, the "orders and interpretations which [the agency] actually applies in the cases before it" are neither predecisional nor deliberative. *Sterling Drug, Inc.*, 450 F.2d at 708. And without providing the type of information described above, Defendants have yet to carry their burden of convincing this Court that the designated redactions are entitled to protection under Exemption 5 on the basis of the deliberative process privilege. *See Arthur Andersen*, 679 F.2d at 257; *Coastal States*, 617 F.2d at 866.

Second and relatedly, Defendants' Vaughn Index fails to identify the particular agency decision that the record document predates, which is necessary to establish that the document is, in fact, predecisional. *See Sen. of the Com. of Puerto Rico on Behalf of Judiciary Comm. v. U.S. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987). It is clear beyond cavil that, "to approve exemption of a document as predecisional, a court must be able 'to pinpoint an agency decision or policy to which the document contributed.'" *Id.* (quoting *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1981)). Although Defendants here cite to the Van Norman declaration in support of their claim that the redactions pertained to "agency decision making with respect to the Wood Bison permit applications[,]" (Defs.' Mot. at 11), that declaration merely restates the elements of the deliberative process privilege and does not actually identify the permit applications as the relevant agency decision. (*See* Suppl. Van Norman Decl. ¶ 9.) Consequently, and for this reason alone, Defendants have clearly missed the mark of a satisfactory Vaughn Index entry.

*Compare Sierra Club v. U.S. Dep't of Interior*, 384 F. Supp. 2d 1, 18 (D.D.C. 2004) (finding a Vaughn Index entry for a "draft of an issue paper" sufficiently specific where the entry stated that the document "describ[ed] the [Arctic National Wildlife Refuge] and its potential for development for oil and gas production," and "include[d] arguments in support of such development, some draft questions and answers, some preliminary identification of advocates and opponents of [] development, and potential legislative initiatives") *with Senate of the Com. of Puerto Rico*, 823 F.2d at 585 (finding that a Vaughn index "consisting almost entirely of each document's issue date, its author and intended recipient, and the briefest of references to its subject matter" is conclusory and "will not do").

Third, and perhaps most significant, Defendants have provided little if any information regarding the *role* of the document's author with respect to the agency's decisionmaking process, or that of the recipient of the document, or how, if at all, the document impacted the agency's deliberations.  A document's context is the *sine qua non* of the court's assessment of whether or not the document is predecisional and deliberative; indeed, "[t]he need to describe each withheld document when Exemption 5 is at issue is particularly acute [precisely] because 'the deliberative process privilege is so dependent upon the individual document and the role it plays in the administrative process.'" *Animal Legal Def. Fund, Inc. v. Dep't of Air Force*, 44 F. Supp. 2d 295, 299 (D.D.C. 1999) (quoting *Coastal States,* 617 F.2d at 867).  For example, "[a] document from a junior to a senior is likely to reflect his or her own subjective opinions and will clearly have no binding effect on the recipient." *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1195 (D.C. Cir. 1991).  By contrast, a document "moving from senior to junior is far more likely to manifest decisionmaking authority and to be the denouement

18

of the decisionmaking rather than part of its give-and-take." *Id.* Similarly, where a document does not "invite a response from the requesting official," it is unlikely to be predecisional or deliberative. *Schlefer v. United States*, 702 F.2d 233, 243 (D.C. Cir. 1983). Not a single entry in Defendant's Vaughn Index provides sufficient detail as to the identities, positions, and job duties of any of the authors or recipients of the withheld documents; consequently, this Court simply cannot properly determine whether the deliberative process privilege applies. *See SafeCard,* 926 F.2d at 1204 (finding that the agency was not entitled to withhold information under the deliberative process privilege because the agency did not "explain such matters as how decisions like those in issue are reached; the role that staff discussion and memoranda play in such decisions; the manner in which such decisions are memorialized and explained; and whether such decisions are treated, in later agency decisionmaking, as precedents")*; Animal Legal Def. Fund*, 44 F. Supp. 2d at 299 (finding that the agency "failed to establish that the documents contributed to the deliberative process" where the agency "identified the deliberative process at issue," but "utterly failed to specify the role played by each withheld document in the course of developing that policy").[8]

In sum, Defendants' Vaughn Index does not permit this Court to make an informed evaluation of whether releasing the documents that were withheld on the basis of the deliberative process privilege would actually implicate the "decisionmaking

---

[8] To the extent that Defendants intended for their summary judgment motion, when read in conjunction with the Vaughn Index, to do some of the work of providing the Court with sufficient context to assess the Exemption 5 withholdings, that document is clearly not up to the task. For example, Defendants' summary judgment motion refers to subcategories of documents that simply do not appear in the Vaughn Index. (*Compare* Defs.' Mot. at 10 (noting that the deliberative process privilege redactions were "designated as Categories 1 (including sub-categories 1a and 1b), 2, 3, 4, and 8" in the Vaughn Index) *with* Vaughn Index (referring to deliberative process privilege redactions through the label "5-DP" and not grouping documents by any other numbered category).) Thus, although the motion suggests that Defendants may have intended to provide the kind of more detailed characterization that Exemption 5 requires, the accompanying Vaughn Index fails to deliver.

processes of government agencies," *Sears*, 421 U.S. at 150 (citing *Tennessean Newspapers, Inc. v. Fed. Hous. Admin.*, 464 F.2d 657, 660 (6th Cir. 1972)), or otherwise "reflect[] advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated[,]" *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (internal quotation marks and citation omitted), in a manner that justifies withholding them. Therefore, this Court concludes that Defendants have thus far failed to satisfy their burden of establishing that Exemption 5 was properly invoked to justify withholding information pursuant to the deliberative process privilege.

2.       The Attorney-Client Privilege

Defendants next claim that the attorney-client privilege justifies the redaction of certain documents under Exemption 5.  (*See* Defs.' Mot. at 9.); *cf. In re Lindsey*, 158 F.3d 1263, 1268 (D.C. Cir. 1998) (noting that the D.C. Circuit has long recognized that "Exemption 5 protects, as a general rule, materials which would be protected under the attorney-client privilege."  (citing *Coastal States*, 617 F.2d at 862)).  For this privilege to apply, the agency must first show that the materials reflect a communication between a lawyer and client; "[i]n the governmental context, the 'client' may be the agency and the attorney may be an agency lawyer." *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997).  The attorney-client privilege applies if the agency proves that the attorney was "acting as a lawyer and the communication was made for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding." *In re Lindsey*, 158 F.3d at 1270 (internal quotation marks and citation omitted).  The privilege protects information that the client imparts to his attorney, as

well as advice that the attorney gives the client in reliance on those facts, *see Schlefer*, 702 F.2d at 245 & n.26; *Brinton v. Dep't of State*, 636 F.2d 600, 605 (D.C. Cir. 1980), and also communications about litigation strategy. *See Feld v. Fireman's Fund Ins. Co.*, 292 F.R.D. 129, 138 (D.D.C. 2013). However, the agency must carry the burden of demonstrating the "confidentiality" of the lawyer-client communication, "both at the time of the communication and maintained since." *Wilderness Soc'y*, 344 F. Supp. 2d at 16 (quoting *Coastal States*, 617 F.2d at 863).

Defendants here assert that they have redacted or otherwise withheld communications between "Attorney-Advisors in DOI's Office of the Solicitor and Department of Justice's Federal Programs Office" that occurred in response to requests for advice regarding how to respond to opposing counsel in the course of ongoing litigation and also related to whether or not to grant the initial permitting decisions. (Defs.' Mot. at 9; Def.'s Response to Pl.'s Opp'n to Defs.' Mot. for Summ. J. & Pl.'s Cross-Mot. for Summ. J. ("Defs.' Reply"), ECF No. 22, at 6.) Defendants also maintain that the documents "contain[ ] litigation strategy and legal advice[,]" (Defs.' Mot. at 9), a characterization that the Van Norman declaration echoes (*see* Suppl. Van Norman Decl. ¶ 44). Because the agency is entitled to a presumption of good faith, this Court accepts that the agency's statements in its briefs regarding the purpose and extent of the redactions are true. *See Judicial Watch*, 802 F. Supp. 2d at 194. The Vaughn Index contains further support for a finding that the attorney-client privilege applies, because the entries that invoke the attorney-client privilege as a basis for the redactions explicitly include such notations as the fact that "[a]ttorneys were discussing with [agency employees] how to respond to opposing counsel[,]" (*see, e.g.*, Vaughn Index Doc. 120), or that the "legal implications of [a] complaint" were being discussed (*id.* Doc. 75); and

with respect to pertinent emails, the subject titles plainly reflect legal work, such as a motion for attorneys' fees in litigation (*id*. Doc. 117), a draft motion vacating a remand order (*id.* Doc. 77), or a settlement recommendation (*id.* Doc. 122). Defendants have also supplied evidence that the agency kept confidential all of the information it withheld pursuant to the attorney-client privilege. (Suppl. Van Norman Decl. ¶ 11.) Thus, Defendants have ably demonstrated that (1) the listed documents were communications between agency employees and agency counsel, *see Tax Analysts*, 117 F.3d at 618; (2) the communications pertained to legal advice or litigation, *see In re Lindsey*, 158 F.3d at 1270; and (3) the content of the communications was kept confidential, *see Wilderness Soc'y*, 344 F. Supp. 2d at 16 (citing *Coastal States*, 617 F.2d at 863), which is all that proper invocation of the attorney-client privilege in the context of FOIA Exemption 5 requires.

Plaintiff's arguments to the contrary are unpersuasive. For example, Plaintiff argues that Defendants have conflated the attorneys who were providing legal advice with those who were participating in the actual permitting decision (*see* Pl.'s Reply in Supp. of its Cross-Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 24, at 11), but the Vaughn Index provides justifications for withholding that are plainly based on the communication of legal advice. *See, e.g.*, Vaughn Index at Docs. 3 ("Attorneys were discussing with clients about its permitting decision and how to respond to opposing counsel"), 11 ("Attorneys were discussing legal implications of the complaint"); *see also* Van Norman Decl. ¶ 11 (explaining that the documents designated as withheld pursuant to the attorney-client privilege "constitute confidential communications between agency attorneys and agency clients, or Federal attorneys and agency clients, for legal matters for which the clients sought professional legal advice"). Similarly, although Plaintiff

contends that the attorney-client privilege entries in the index fail to distinguish between emails that an attorney wrote to the client and those that the client wrote to the attorney (*see* Pl.'s Mot. at 17), the attorney-client privilege shields communications from both sides of this relationship. *See Tax Analysts*, 117 F.3d at 618 ("The attorney-client privilege protects confidential communications from clients to their attorneys . . . [as well as] communications from attorneys to their clients[.]").

Plaintiff's most potent rebuttal argument is the assertion that Defendants are not entitled to make Exemption 5 redactions under the attorney-client privilege at all because the agency's attempt to conceal the true (political) reasons for the permit denials constituted fraudulent misconduct. (Pl.'s Mot. at 16-18.) In this regard, Plaintiff maintains that the well-established crime-fraud exception renders the agency's attorney-client communications without protection and categorically subject to disclosure. (*See id.*) To be sure, under the crime-fraud exception, communications between a lawyer and client "are not privileged if they 'are made in furtherance of a crime, fraud, or other misconduct.'" *In re Grand Jury*, 475 F.3d 1299, 1305 (D.C. Cir. 2007) (quoting *In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985)); *see also In Re Sealed Case*, 223 F.3d 775, 778 (D.C. Cir. 2000). But the party seeking to apply the crime-fraud exception has the burden of establishing its application, *In re Sealed Case*, 107 F.3d 46, 49-50 (D.C. Cir. 1997), which, in the context of the attorney-client privilege, requires a prima facie showing that (1) the client "'made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act,'" and (2) "that the client actually 'carried out the crime or fraud.'" *In re Sealed Case*, 223 F.3d at 778 (quoting *In re Sealed Case*, 107 F.3d at 49); *see also Nesse v. Pittman*, 202 F.R.D. 344, 352 (D.D.C.

2001) (noting that a "plaintiff must make a prima facie showing of [misconduct] before the privilege will yield").

Plaintiff has failed to prove that any crime or fraud was committed here, let alone that the communications at issue were made with an intent to further the unlawful act. Plaintiff appears to label as criminal and fraudulent the fact that the FWS allegedly permitted policy rationales to outweigh scientific factors in its initial permit decision, as well as the agency's refusal to disclose what Plaintiff characterizes as the agency's true reasons for denying the permit applications. (*See* Pl.'s Mot. at 1-2; *id.* at 17 (labeling as "fraudulent misconduct" the agency's alleged "deliberate practice or policy designed to conceal as much about the [agency's] permitting decisions as possible").) However, it is not at all clear that Congress has criminalized the deliberate withholding of information about an agency's decisionmaking process in a manner that would render it a crime or fraud; to the contrary, the FOIA expressly permits withholding of certain information regarding an agency's deliberations, including confidential communications between agency lawyers and their client. It is also clear that the statutorily-prescribed remedy for the underlying problem of improper agency decision making—including the improper decision to allow politics to overshadow scientific evidence, *see Wood Bison II,* 851 F. Supp. 2d at 43—is judicial review and a remand to the agency for a more appropriately-reasoned decision, *not* criminal charges, fines, or penalties. *See* 5 U.S.C. §§ 701-706 (2014).[9]

What is more, even if the agency's alleged deliberate concealment rose to the level of criminal conduct, Plaintiff has offered no evidence to demonstrate that the

---

[9]  The Supreme Court has taken care to note that the even the Endangered Species Act's citizen-suit provision, which allows individuals to commence civil suits to challenge agency misconduct, does not allow plaintiffs to file suits challenging "maladministration" of permitting decisions or any other agency action under the ESA. *See Wood Bison II,* 851 F. Supp. 2d at 55.

particular communications at issue here were made in order to further or facilitate that goal. *See Nesse*, 202 F.R.D. at 351-52 ("Confronted with a claim that the advice was sought to further a crime or fraud, this Circuit insists upon a showing of a prima facie case that the client was planning or engaged in a crime or fraud *when the legal advice was sought* before it will invoke the crime/fraud exception, lest the privilege disappear only because a crime or fraud is charged.") (citing *In re Sealed Case*, 754 F.2d at 399); *cf. In re Sealed Case,* 107 F.3d at 50 ("True enough, within weeks of the meeting [with counsel] about [the relevant law], the [company official] violated that law. But the government had to demonstrate that the Company sought the legal advice with the intent to further its illegal conduct."). All things considered, then, this Court concludes that Plaintiff has failed to establish any factual or legal basis for its contention that Exemption 5 attorney-client privilege protection is unavailable to Defendants during the instant FOIA litigation because the agency's prior decision making process with respect to the wood bison permit applications constituted fraud.

In the final analysis of Defendants' invocation of the attorney-client privilege as a basis for some of its redactions, Defendants' materials demonstrate that the FWS—which acted on the wood bison permit applications while in the midst of a lawsuit regarding its delinquency with respect to those same applications—ultimately made redactions to certain documents in the administrative record that contained confidential communications regarding the litigation and related legal matters. The relatively detailed entries in Defendants' Vaughn Index related to the attorney-client privilege, coupled with the Van Norman declaration and the context of the *Wood Bison* litigation, are enough to satisfy this Court that the Defendants have met their burden of justifying the Exemption 5 redactions that were made based on the attorney-client privilege.

3.      The Work-Product Doctrine

Finally, Defendants' Vaughn Index indicates that a small number of redactions were made under Exemption 5 based on the protection of the work-product doctrine. (Vaughn Index at Docs. 1, 2, 3, 4, 5, 6, 7, 8, 11, 12, 96.)  Even in the FOIA context, "[t]he starting place for evaluating the scope of the attorney work-product doctrine is Federal Rule of Civil Procedure 26(b)(3), which protects 'ordinarily,' those 'documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative[.]'" *Shapiro v. U.S. Dep't of Justice*, 969 F. Supp. 2d 18, 27 (D.D.C. 2013) (quoting Fed. R. Civ. P. 26(b)(3)(A)).  The D.C. Circuit has instructed that, when FOIA is at issue, the work product doctrine "should be interpreted broadly and held largely inviolate." *Judicial Watch v. U.S. Dep't of Justice*, 432 F.3d 366, 369 (D.C. Cir. 2005).  The doctrine protects both "factual and deliberative" matters, because "the risk is apparent that an attorney's discussion of factual matters may reveal his or her tactical strategic thoughts." *Shapiro*, 969 F. Supp. 2d at 28 (citing *Mervin v. FTC*, 591 F.2d 821, 825-26 (D.C. Cir. 1978)).

Where the FOIA is concerned, the work product doctrine protects documents long after the litigation has ended.  *See id.* at 28 (noting that under Exemption 5, documents may fall under the work-product doctrine even after the litigation for which they were prepared has ended).  The party asserting that the doctrine applies bears the burden of demonstrating a subjective belief of the possibility of litigation at the time the document was created.  *Id.* at 31.  That party also bears the burden of demonstrating that the documents it seeks to withhold reflect legal strategy, not merely "information, which is already or may be available to an adversary, or has no implications for the adversary process."  *Id.* at 32.

Here, as noted above, Defendants claim that the redactions in 8 of the 175 documents were made pursuant to the work-product doctrine. (*See* Vaughn Index at Docs. 1, 2, 3, 4, 5, 6, 7, 8, 11, 12, 96; *see also* Suppl. Van Norman Decl. ¶10.) Despite that assertion, in the Vaughn Index, Defendants do not provide any information to support the 'work product' contention; rather, the document descriptions merely state that the redactions pertain to attorney-client communications. (*See, e.g.*, Vaughn Index Docs. 3, 4.) And although Defendants mention the work product doctrine in a heading of their motion (*see* Defs.' Mot. at 9 ("[Defendants] Properly Invoked The Attorney-Client And Attorney Work Product Privileges Under Exemption 5")), in that section of their brief, Defendants do not even make an effort to define the work-product doctrine or its scope. (*See id.* at 9-11; *see also* Defs.' Reply at 5-6 (referencing "the Exemption 5 privileges" generally and declining to discuss the work product doctrine).) Nor does Defendant's reply brief remedy the oversight; indeed, Defendants skip the law regarding proper application of the work product doctrine entirely and detour directly to the conclusory statement that the documents identified in the Vaughn Index as "work product records" are "those documents created once it was clear to the Department that the [permit] matter would likely lead to litigation" and documents "created during the course of the litigation[,]" (Defs.' Reply at 6)—thus, stating the elements of the privilege without providing context.

Notably, given the factual background of this case—in particular, the fact that Defendants were engaged in litigation regarding the wood bison permits at the heart of this FOIA request—it is entirely conceivable that the work product-related documents have been appropriately withheld, but Defendants' failure to identify with specificity whether or not each document was prepared for the purpose of litigation in the index

itself, or to explain whether the redactions pertain to legal strategy and not merely factual matters that would have been presented to an adversary, *see Shapiro*, 969 F. Supp. 2d at 28, makes it impossible for the Court to reach the conclusion that Exemption 5 was properly invoked. *Cf. Cuban v. S.E.C.*, 795 F. Supp. 2d 43, 55-56 (D.D.C. 2011) (accepting defendant's assertion of the work product privilege after a rejection of defendant's initial submissions, on the basis of supplemental materials that included an "expla[nation of] the role of an attorney in the creation of each document withheld as work product," the basis of the attorney's "subjective belief that litigation was a real possibility," and information that demonstrated "that the belief was objectively reasonable"). Put another way, at present, Defendants have failed to present sufficient evidentiary support to sustain a finding that the work product doctrine justifies the redactions.

### B.     Exemption 6 Withholdings

Finally, Defendants appear to have redacted 27 documents under Exemption 6, which permits the withholding of information that identifies particular individuals, such as "place of birth, date of birth . . . employment history, and comparable data[.]" *See Ludlam v. U.S. Peace Corps*, 934 F. Supp. 2d 174, 184 (D.D.C. 2013) (citing *Dep't of State v. Washington Post Co.*, 456 U.S. 595, 600 (1982) (explaining that information "unrelated to any particular person" is not protected). It has long been held that personal data and information can be redacted from documents produced under the FOIA in the interest of privacy. *See, e.g.*, *Shapiro v. Dep't of Justice*, No. 13-0729, 2014 WL 1280275, at *5 (D.D.C. Mar. 31, 2014) (redacting names, numbers, and any other possibly identifying information); *Gov't Accountability Project v. U.S. Dep't of State*,

699 F. Supp. 2d 97, 106 (D.D.C. 2010) (personal email addresses); *Schmidt v. Shah*, No. 08-2185, 2010 WL 1137501, at *9 (D.D.C. Mar. 18, 2010) (employees' home telephone numbers). Here, Defendants' Vaughn Index demonstrates that the redactions made pursuant to Exemption 6 involved particular employees, and that only such personalized information was redacted, while the remainder was released. (*See, e.g.*, Vaughn Index Docs. 10 (redacting document pursuant to Exemption 6 in order to withhold "an individual's phone number and password"), 18 (same to withhold "an individual's personal reason to be away from the office"), 19 (same to withhold "an individual's personal email account"), 34-36 (same to "protect the identity of an individual's personal time outside of work").)

Defendants contend that they redacted "information about [employees'] family members, cell phone numbers, personal travel plans and personal email addresses" pursuant to Exemption 6. (Defs.' Mot. at 11; *see, e.g.*, *Vaughn* Index at Docs. 9-10 ("This document has been released, but partially redacted to protect the individual personal activity outside of their job.").) Defendants also argue that because the personal information withheld does not shed any light on agency operations, the Exemption 6 balancing test weighs in favor of redaction. (Defs.' Mot. at 11 ("This information provides no insight into how the DOI or DMA perform their statutory duties. Therefore, there is no public interest in disclosure and Defendants correctly determined that the individuals' privacy interests in this information is dispositive.").); *See also U.S. Dep't of Def. Dep't of Military Affairs.*, 964 F.2d 29 (D.C. Cir. 1992). Plaintiff responds— without evidentiary support—that any Exemption 6 redactions must be "indicative of threats" to that employee based on the purported permit scandal. (*See* Pl.'s Reply, ECF

No. 24, at 4 n.1.)  Elsewhere, however, Plaintiff concedes that "some of the [Exemption 6] redactions may be proper[.]"  (Pl.'s Mot. at 1.)

Weighing the interests at issue, this Court accepts Defendants' contention that the personal information redacted from the documents pursuant to Exemption 6 "would shed little or no light" on the agency's performance of its duties (Suppl. Van Norman Decl. ¶ 14)—a characterization that is entitled to "a presumption of good faith, [and] cannot be rebutted by purely speculative claims[.]"  *Negley v. FBI*, 169 F. App'x 591, 594 (D.C. Cir. 2006).  Notably, Plaintiff does not argue that this information is not protectable under Exemption 6, but instead makes only purely speculative assertions regarding the potential reasons why this type of personal information appears in the responsive documents in the first place.  (*See, e.g.*, Pl.'s Mot. at 1 n.1 ("Plaintiff normally would not contest the withholding of personal information . . . under Exemption 6, except in this instance such information appearing in the permit decision[]making process is peculiar in itself unless the attorneys are threatening the employees with their jobs to alter their scientific fact findings.").)  There is nothing about application of Exemption 6 that in any way turns on the *reasons* for personal information having been included in responsive documents; thus, in addition to Plaintiff's failure to provide any support whatsoever for the threat contention, Plaintiff has also failed to rebut Defendants' assertion that such information exists in the relevant documents and is entitled to redaction on the basis of its personal nature.

## IV.    CONCLUSION

For the foregoing reasons, the Court will **GRANT IN PART** Defendants' motion for summary judgment.    Specifically, the Court will enter summary judgment for

Defendants with respect to the application of Exemption 6 to justify the redaction of personal information from the documents at issue, and it will also enter summary judgment for the Defendants regarding those Exemption 5 redactions in the existing Vaughn Index that are based on the attorney-client privilege. With respect to the other Exemption 5 redactions, this Court will **DENY WITHOUT PREJUDICE** the parties' cross-motions for summary judgment, and will permit Defendants to file a supplemental Vaughn Index, affidavit, or declaration that provides the necessary additional information regarding the redacted documents. For example, as regards the deliberative process privilege, any supplemental materials must clarify the particular documents with respect to which Defendants wish to assert that privilege; must identify the agency decision that the record preceded; and must explain the material's role in the agency decision making process. To the extent that Defendants continue to seek to assert the work-product privilege, Defendants must submit supplemental material that identifies with specificity which documents were prepared for the purpose of litigation or otherwise explains whether the redactions pertain to legal strategy and not merely factual matters.[10]

As set forth in the order accompanying this memorandum opinion, Defendants will have thirty days from the date of this memorandum opinion either to release the challenged content that was withheld based upon the deliberative process privilege and

_____

[10] Defendants need only one exemption-based rationale for each particular withholding. *See Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.*, 384 F. Supp. 2d 100, 109 (D.D.C. 2005) (noting that "if the defendants have withheld information on the basis of multiple exemptions, the court need only rely on one exemption for each piece of exempted material") (citing *Kanter v. Dep't of State,* 479 F.Supp. 921, 928 n. 9 (D.D.C.1979))). To the extent that this Court has already deemed a redaction properly withheld pursuant to the instant ruling, no additional information need be provided regarding that redaction in any supplemental materials, even if alternative bases for the particular withholding have been asserted. Additionally, each redaction made in a document must be supported, despite the fact that other redactions made in that same document may have been upheld. (*See, e.g.*, Vaughn Index at Doc. 144 (redaction of "individual's personal email address" pursuant to Exemption 6 is acceptable, however other redactions made pursuant to Exemption 5's deliberative process privilege require additional support).) Furthermore, in light of this Court's decision to provide Defendants with an opportunity to cure the defects in their Vaughn Index, this Court declines to engage in any *in camera* review of the documents at this time.

the work-product doctrine, or to substantiate the redactions with supplemental materials as described.  If Defendants opt to file supplemental materials, both parties will then be permitted to re-file motions for summary judgment related to any renewed invocation of Exemption 5 on deliberative process or work product grounds.


DATE: September 2, 2014                *Ketanji Brown Jackson*
                                       KETANJI BROWN JACKSON
                                       United States District Judge